STEGALL v. THURMAN, Sheriff and Jailer.

(District Court, N. D. Georgia. January 27, 1910.)

1. UNITED STATES (§ 40*)—EXECUTIVE DEPARTMENTS—FORCE AND EFFECT OF REGULATIONS AS LAW.

Regulations issued by the Secretary of the Treasury with reference to the internal revenue and for the government of the officers of the Revenue Department have the force and effect of law and are as binding as if incorporated in the statute law of the United States.

[Ed. Note.—For other cases, see United States, Dec. Dig. § 40.*]

2. WITNESSES (§ 216*)—PRIVILEGE—INFORMATION OBTAINED BY INTERNAL REVENUE OFFICER OR AGENT.

Under the regulations of the Internal Revenue Department promulgated with the approval of the Secretary of the Treasury, providing that officers of the department "will decline to testify as to facts contained in the records, or coming to their knowledge in their official capacity; and this prohibition is hereby extended to include also internal revenue storekeepers and gaugers and agents"—a storekeeper and gauger stationed at a distillery has no right to divulge information in regard to the business of the distiller obtained by him solely in his official capacity as an internal revenue officer, even when called as a witness in a state court.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. § 779; Dec. Dig. § 216.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. HABEAS CORPUS (§ 45*)—FEDERAL COURTS—DISCHARGE OF STATE PRISONER.

Where an officer of the Internal Revenue Department is imprisoned for contempt for a refusal to testify in a state court or before a grand jury with respect to facts learned by him in his official capacity which he is prohibited from divulging by the regulations of the department, the case is one of urgency, in which a federal court is not required to await the final action of the state courts, but should discharge the prisoner on a writ of habeas corpus.

[Ed. Note.—For other cases, see Habeas Corpus, Cent. Dig. §§ 38, 43; Dec. Dig. § 45;* Courts, Cent. Dig. §§ 1381, 1384.

Jurisdiction of federal courts in habeas corpus proceedings, see note to In re Huse, 25 C. C. A. 4.]

Proceeding by Charles E. Stegall against R. W. Thurman, Sheriff and Jailer of Dade County, Ga.; for writ of habeas corpus. Petitioner discharged.

F. C. Tate, U. S. Atty., and Jno. W. Henley, Asst. U. S. Atty.

John C. Hart, R. R. Arnold, and T. C. Milner, Sol. Gen., for defendant.

NEWMAN, District Judge. Application was made by Charles E. Stegall, in this court, for the issuance of a writ of habeas corpus to be directed to R. W. Thurman, sheriff and jailer of Dade county, Ga. The petition of Charles E. Stegall alleges: That he was a storekeeper and gauger, assigned for duty at Distillery No. 3, of George W. Cureton, at Rising Fawn, in Dade county, Ga. That he was subpœnaed to appear as a witness before the grand jury of the superior court of Dade county to testify on behalf of the state touching the operations of said distillery. That he declined to answer certain questions propounded to him, upon the ground that all the knowledge he had as to the operation of Cureton's distillery, was obtained and came to him from the records of the Internal Revenue Department, or was obtained by him solely and only in his official capacity as storekeeper and gauger. Thereupon, and on account of his declining to answer, he was committed for contempt, and was in jail when the writ was issued. Return was made, the body of the petitioner produced, and an answer filed by the sheriff.

Upon the hearing, an agreement was made by counsel as to some of the facts, and brief testimony taken as to others. It is agreed now that the question put to Stegall before the grand jury, and on which the present decision turns, was this: Referring to George W. Cureton's distillery, "What is being manufactured at that place?" and the inquiry is whether, under the facts, Stegall should have been required to answer that question, or whether, in refusing to answer, he exercised a right under the laws of the United States, and the rules and regulations of the Treasury Department, which right would authorize his discharge under this habeas corpus proceeding.

The following testimony of Stegall will show his connection with the distillery, and the character of his knowledge of what was being done there:

"Q. When did you go to this distillery as storekeeper and gauger? A. I have had three assignments there.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

"Q. When was the first one? A. The first one was in July of last year; that is my recollection.

"Q. How long did you stay there then? A. Till the 1st day of November of the same year.

"Q. When was your next assignment? A. The 1st day of March, this year.

"Q. How long did you stay there at that time? A. Till the 18th day of March.

"Q. From the 1st of March till the 17th? A. Yes, sir.

"Q. Now, this last time? A. The 18th day of May, this year.

"Q. And you stayed there until this transpired? A. Yes, sir.

"Q. I want to know if you had occasion to visit that distillery, or know anything about it, and in what respect do you know what was around there. and what was being done there? A. I know nothing except what knowledge was gained as an officer.

"Q. Were you ever there in that distillery? A. Except as an officer?

"Q. Yes. A. No, sir; I never was.

"Q. You were never there between any of these visits? A. No, sir.

"Q. When assigned, did you go directly there and relieve somebody else? A. Yes, sir; when I was assigned I went to relieve another man.

"Q. And you stayed there until you were relieved by somebody? A. Yes, sir.

"Q. And what you know about it is during periods when you were there as storekeeper and gauger? A. Yes, sir.

"Q. Were you there in that capacity all three times? A. Yes, I was there as storekeeper and gauger.

"Q. All three times as storekeeper and gauger? A. Yes, sir."

He then answered two other questions by the district attorney, as follows:

"Q. Have you any personal knowledge relative to the operations of Cureton's distillery in Dade county, or the products manufactured there, except such knowledge as you obtained in your official capacity as storekeeper and gauger, while in the discharge of your official duties? A. I have no other knowledge except official knowledge.

"Q. Have you any personal knowledge relative to the matters about which you were interrogated and refused to answer before the grand jury in Dade county, recently, except such knowledge as you obtained in your official capacity as storekeeper and gauger at that distillery, while in the discharge of your official duties? A. I did not have any other knowledge except official knowledge."

It is not denied, as I understand it, that the only knowledge Stegall had of what was being done at Cureton's distillery was knowledge which he obtained while there in his official capacity as storekeeper and gauger, and it is not claimed that Stegall had any knowledge except such as he obtained while there officially. The contention on behalf of the sheriff is, notwithstanding the fact that Stegall was at the distillery only in his official capacity, that he had personal knowledge, knowledge as an individual, of what was being done at the distillery; that is to say, the contention is he saw as an individual, notwithstanding his presence as an official. Is this contention sound? That is the question for determination here.

Section 3167, Rev. St. U. S. (U. S. Comp. St. 1901, p. 2058), is as follows:

"That it shall be unlawful for any collector, deputy collector, agent, clerk, or other officer or employé of the United States, to divulge or to make known in any manner whatever not provided by law to any person the operations, style of work or apparatus of any manufacturer or producer visited by him in this discharge of his official duties, or the amount or source of income, profits, losses, expenditures, or any particulars thereof, set forth or disclosed in any

income return by any person or corporation, or to permit any income return or copy thereof or any book containing any abstract or particulars thereof. to be seen or examined by any person except as provided by law; and it shall be unlawful for any person to print or to publish in any manner whatever not provided by law, any income return or any part thereof of the amount or source of income, profits, losses, or expenditures appearing in any income return; and any offense against the foregoing provision shall be a misdemeanor and be punished by a fine not exceeding $1,000.00 or by imprisonment not exceeding one year, or both, at the discretion of the court; and if the offender be an officer or employé of the United States, he shall be dismissed from office and be incapable thereafter of holding any office under the government."

In addition to this statute, certain rules and regulations have been promulgated by the Treasury Department. These rules and regulations have been made pursuant to the statutes. The following statutes of the United States are pertinent to this question, as follows:

Rev. St. U. S. § 161 (U. S. Comp. St. 1901, p. 80): "The head of each department is authorized to prescribe regulations, not inconsistent with law, for the government of his department, the conduct of its officers and clerks, the distribution and performance of its business, and the custody, use, and preservation of the records, papers and property appertaining to it."

Rev. St. U. S. § 251 (U. S. Comp. St. 1901, p. 138): "The Secretary of the Treasury shall make and issue from time to time, such instructions and regulations to the several collectors, receivers, depositaries, officers, and others who may receive treasury notes, United States notes or other securities of the United States, or who may be in any way engaged or employed in the preparation and issue of the same, as he shall deem best calculated to promote the public convenience and security, and to protect the United States, as well as individuals, from fraud or loss; he shall prescribe forms of entries, oaths, bonds, and other papers, and rules and regulations, not inconsistent with law, to be used under and in the execution and enforcement of the various provisions of law relating to raising revenue from imports, or to duties on imports, or to warehousing; he shall give such directions to collectors and prescribe such rules and forms to be observed by them as may be necessary for the proper execution of the law; he shall also prescribe the forms of the annual statements to be submitted to Congress by him showing the actual state of commerce and navigation between the state and foreign countries; or otherwise between the collection districts of the United States, in each year."

Rev. St. U. S. § 3215 (U. S. Comp. St. 1901, p. 2084): "It shall be the duty of the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, to establish such regulations not inconsistent with law, for the observance of revenue officers, district attorneys, and marshals, respecting suits arising under the internal revenue laws in which the United States is a party, as may be deemed necessary for the just responsibility of those officers and the prompt collection of all revenues and debts due and accruing to the United States under such laws."

In pursuance of the foregoing statutes of the United States, rules and regulations were issued by the Treasury Department, as follows:

"Treasury Department, Office of Commissioner of Internal Revenue.

"Washington, D. C., April 15, 1898.

"The following regulations are issued as supplementary to the instructions and suggestions contained on pages 41 and 42 of the Regulations, series 7, No. 12, Revised, August 3rd, 1896:

"All records in the offices of collectors of internal revenue or of any of their deputies are in their custody and control for purposes relating to the collection of the revenues of the United States only. They have no control of them, and no discretion with regard to permitting the use of them, for any other purpose.

"Collectors are hereby prohibited from giving out any special-tax records, or any copies thereof, to private persons or to local officers, or to produce such records, or copies thereof, in a state court, whether in answer to subpœnas duces tecum or otherwise.

"Whenever such subpœnas shall have been served upon them, they will appear in court in answer thereto, and respectfully decline to produce the records called for, on the ground of being prohibited therefrom by the regulations of this department.

"The information contained in the records relating to special-tax payers, in the collector's office, is furnished by these persons under compulsion of law for the purpose of raising revenue for the United States; and there is no provision of law authorizing the sending out of these records, or of any copies thereof, for use against the special-tax payers in cases not arising under the laws of the United States. The giving out of such records, or any copies thereof, by a collector in such cases is held to be contrary to public policy and not to be permitted.

"As to any other records than those relating to special-tax payers, collectors are also forbidden to furnish them, or any copies thereof, at the request of any person. Where copies thereof are desired for the use of parties to a suit, whether in a state court, or in a court of the United States, collectors should refer the persons interested to the following paragraph in rule X, of the Rules and Regulations of the Treasury Department, namely:

"'In all cases where copies of documents or records are desired by, or on behalf of, parties to a suit, whether in a court of the United States, or any other, such copies shall be furnished to the court only, and on a rule of the court upon the Secretary of the Treasury requesting the same.'

"Whenever such rule of court shall have been obtained, collectors are directed to carefully prepare a copy of the record or document containing the information called for, and send it to this office, whereupon it will be transmitted to the Secretary of the Treasury with a request for its authentication under the seal of the department and transmission to the judge of the court calling for it, unless it should be found that circumstances or conditions exist which make it necessary to decline, in the interest of the public service, to furnish them such copy.                                              N. B. Scott, Commissioner.

"Approved: L. J. Gage, Secretary of the Treasury."

These rules and regulations were referred to and discussed, and held to be valid and reasonable in the case of Boske v. Comingore, 177 U. S. 459, 20 Sup. Ct. 701, 44 L. Ed. 846.

After this, the following regulation was issued:

"Treasury Department, Office of the Commissioner of Internal Revenue.

"Washington, D. C., October 10, 1900.

"To Collectors of Internal Revenue, Revenue Agents, and Subordinate Officers of Internal Revenue:

"Referring to the frequent requests for information concerning the public records relating to internal revenue taxes and internal revenue taxpayers, collectors of internal revenue are advised as follows:

"First: Information contained in the reports of taxpayers and the records of collectors of internal revenue is obtained by virtue of law, and with the exception of such information as is contained in record No. ten, must not be disclosed to the public, nor to any officer of any department of the government, nor to any person except of the Treasury or the authorized agents of this bureau and the Secretary of the Treasury or upon his order, without instruction from the Commissioner of Internal Revenue.

"Second: Where information concerning such records is called for, collectors will under no circumstances whatever comply with such request until they shall have communicated with the commissioner of internal revenue and received instructions concerning the same, except where the request is from the Secretary of the Treasury, in which case the request will be complied with at once without communicating with the Commissioner of Internal Revenue.

175 F.—52

"Collectors and revenue agents will acknowledge receipt of this circular and supply the employés under their supervision with a copy of the same. They will see that the instructions contained therein are complied with.

"Robert Williams, Jr., Acting Commissioner."

Subsequently the following regulations were promulgated:

"All records in the offices of collectors of internal revenue, or of any of their deputies, are in their custody and control for purposes relating to the collection of the revenues of the United States only. They have no control of them, and no discretion with regard to permitting the use of them, for any other purpose.

"Collectors are hereby prohibited from giving out any special-tax records, or any copies thereof, to private persons or to local officers, or to produce such records, or copies thereof, in a state court, whether in answer to subpœnas duces tecum or otherwise.

"Whenever such subpœnas shall have been served upon them, they will appear in court in answer thereto and respectfully decline to produce the records called for on the ground of being prohibited therefrom by the regulations of this department. They will decline to testify as to facts contained in the records, or coming to their knowledge in their official capacity; and this prohibition is hereby extended to include also internal revenue storekeepers and gaugers, and agents.

"The information contained in the records relating to special-tax payers, in the collector's office, is furnished by these persons under compulsion of law for the purpose of raising revenue for the United States; and there is no provision of law authorizing the sending out of these records, or of any copies thereof, for use against the special-tax payers in cases not arising under the laws of the United States. The giving out of such records, or any copies thereof, by a collector in such cases, is held to be contrary to public policy and not to be permitted.

"As to any other records than those relating to special-tax payers, collectors are also forbidden to furnish them, or any copies thereof, at the request of any person. Where copies thereof are desired for the use of parties to a suit, whether in a state court or in a court of the United States, collectors should refer the persons interested, to the following paragraph in rule No. X of the Rules and Regulations of the Treasury Department, namely:

" 'In all cases where copies of documents or records are desired by, or on behalf of, parties to a suit, whether in a court of the United States, or any other, such copies shall be furnished to the court only, and on a rule of the court upon the Secretary of the Treasury requesting the same.'

"Whenever such rule of court shall have been obtained, collectors are directed to carefully prepare a copy of the record or document containing the information called for and send it to this office, whereupon, it will be transmitted to the Secretary of the Treasury with a request for its authentication under the seal of the department and transmission to the judge of the court calling for it, unless it should be found that circumstances or conditions exist which make it necessary to decline, in the interest of the public service, to furnish such copy."

These regulations were issued by John W. Yerkes, Commissioner, and approved by Leslie M. Shaw, Secretary of the Treasury, as appears on the regulations.

Subsequently, certain regulations were issued, to which attention has been called, with reference to retail liquor dealers; but these are not material here.

It may be proper to inquire, first, whether these regulations are authorized by law, and in accordance with law. It is fully settled in many cases that the regulations issued by the Secretary of the Treasury with reference to the question of internal revenue, and for the government of the officers of the Revenue Department, have the force

and effect of law, and are as binding as if incorporated in the statute law of the United States. United States v. Barrows, 1 Abb. (U. S.) 351, 24 Fed. Cas. No. 14,529; United States v. Hutton, 10 Ben. (U. S.) 268, 26 Fed. Cas. No. 15,433; In re Huttman (D. C.) 70 Fed. 699; In re Weeks (D. C.) 82 Fed. 729; United States ex rel. Flynn v. Fuellhart (C. C.) 106 Fed. 911; In re Lamberton (D. C.) 124 Fed. 446; Boske v. Comingore, supra; Ex parte Reed, 100 U. S. 13, 25 L. Ed. 538; Gratiot v. United States, 4 How. 80, 11 L. Ed. 884.

In concluding the opinion in Boske v. Comingore, supra, Mr. Justice Harlan says, in reference to the promulgation of regulations by the Secretary of the Treasury for collectors of internal revenue:

"In determining whether the regulations promulgated by him are consistent with law, we must apply the rule of decision which controls when an act of Congress is assailed as not being within the powers conferred upon it by the Constitution; that is to say, a regulation adopted under section 161 of the Revised Statutes should not be disregarded or annulled unless, in the judgment of the court, it is plainly and palpably inconsistent with law. Those who insist that such a regulation is invalid must make its invalidity so manifest that the court has no choice except, to hold that the Secretary has exceeded his authority, and employed means that are not at all appropriate to the end specified in the act of Congress."

I do not understand it to be contended here, however, that these regulations are inconsistent with law. No attack is made in argument upon these regulations. What is insisted strongly and earnestly is that the individual may be separated, as it were, from the official. What he discovers by the use of his senses, what he sees with his eyes, it is urged, he may testify to; that he knows it as an individual, although as an official he was on the spot, and acting in the discharge of his duty as such official.

In the last regulation referred to (No. 12, of April 18, 1904) it will be perceived that, among other things, it is said:

"They will decline to testify as to facts contained in the records, or coming to their knowledge in their official capacity; and this prohibition is hereby extended to include also internal revenue storekeepers and gaugers and agents."

Assuming this regulation to be within the authority of the Secretary of the Treasury under the statute, and thereby becoming law and controlling on storekeepers and gaugers, can a storekeeper and gauger testify to facts he ascertains at a distillery, when he is there only in his capacity as a storekeeper and gauger?

The District Courts have passed on similar questions on several occasions. In re Huttman, supra, was decided by Judge Williams in the District Court of Kansas. This was a habeas corpus case; Huttman being a deputy collector of internal revenue, and having been committed for contempt for declining to answer certain questions propounded to him in the state court. Among other things in the opinion by Judge Williams, this is said:

"In this case it seems that an officer of the government, acting in conformity with or under the revenue laws of the United States, was called upon to testify in a state court with reference to something that transpired in his office between him and a citizen in relation to the enforcement of the revenue laws. Congress has given to the commissioner of internal revenue, without qualification, the power to make and enforce upon his subordinate officers all reason-

able regulations in the matter of the collection of internal revenue. These regulations are not to be questioned by this court, but must be upheld and enforced, and they must be regarded by all as having the same force as an act of Congress. As before stated, the commissioner of internal revenue, with the approval of the Secretary of the Treasury, by statute is given the power to make such regulations as he deems necessary in the matter of the assessment and collection of internal revenue. It has been frequently decided that such regulations have the force of statutes." [Citing United States v. Eliason, 16 Pet. 291, 10 L. Ed. 968; Gratiot v. United States, 4 How. 80, 11 L. Ed. 884; Alvord v. United States, 95 U. S. 356, 24 L. Ed. 414; Ex parte Reed, 100 U. S. 13, 25 L. Ed. 538.]

"And the acts of the commissioner in matters relating to the revenue are presumed to be the acts of the Secretary. Parish v. United States, 100 U. S. 500 [25 L. Ed. 763]. * * *

"It is claimed by the Assistant Attorney General of the state of Kansas that the question here does not involve the production of the records of the internal revenue office; but the questions which were asked the deputy collector, if answered, would have required him to divulge communications made to him by an applicant for a special tax stamp, with the express and understood purpose of making the record itself. It is stated in the petition that all conversations between the petitioner and the defendant which were required to be divulged in the state court were made with the purpose of embodying them in the records of the internal revenue office, and to divulge such conversations would be to divulge the contents of the records that were made up in the enforcement of the revenue laws of the United States. If the records cannot be produced, how can the conversation and actions of the parties which led up to the making of such records be produced? The distinguished judge of the state court, on motion of the United States attorney, quashed so much of the subpœna duces tecum served on the petitioner as required him to produce the records of his office; but when the witness was asked questions the answers to which required him to tell what such records contained, the state court, on his refusal to answer such questions, ordered him committed for contempt. It is impossible to distinguish between the two propositions, and I am of the opinion that the petitioner was right in declining to answer the questions. I base this opinion, not on any mere rule as to primary or secondary evidence, but because that which cannot be done directly in this respect cannot be done indirectly. If the regulations of the commissioner of internal revenue forbidding the disclosure of the contents of the records in the offices of the various collectors of internal revenue are to be enforced, it is necessary, not only to protect the officers from producing the records, but from divulging statements from which such records are made. In my judgment, internal revenue officers are not subject to the orders of the state courts when obedience to such orders would require such officers to disobey the rules and regulations established by the general government. * * *

"It is suggested by counsel for the state that the information sought to be elicited from the petitioner is necessary in the enforcement of the prohibitory liquor law of the state; but assuredly that suggestion, if true, can furnish no ground for changing an absolute rule of law governing an important bureau of the general government. It is not that the United States has any desire to interfere with or prevent the enforcement of any criminal law which the people of the state may see fit to enact. It is simply a question whether, when the officers of the state, in attempting to enforce one of her laws, seek to transgress a statute, or what is tantamount to a statute, of the United States, it is not the duty of the federal courts, on proper application, to see to it that the national law is upheld."

In re Weeks, supra, was a decision by Judge Wheeler in the District Court of Vermont. This was a habeas corpus case also; Weeks being a deputy collector of internal revenue in Vermont. He was called upon to testify in the state court as to the purchase by certain persons of a retail liquor dealer's tax stamp. Weeks, declining to answer cer-

tain questions, was committed for contempt. An extract from the opinion by Judge Wheeler is as follows:

"The relator is deputy collector in Vermont, and was summoned to attend as a witness at the trials of several persons in a court of this state for selling liquor, and to produce and exhibit all books and papers in his possession showing, or tending to show, that the respondents had paid any special tax for the sale of liquors in 1896 or 1897 at Montpelier. These instructions had been furnished to him by his superior for his guidance. In the trial of one respondent, he was asked whether the respondent had ever paid him any money for the purpose of obtaining a retail liquor dealer's special tax stamp, and answered that he could not remember, but supposed he had means of ascertaining; whereupon he was asked to ascertain and state the fact, which he declined to do, because his means of knowledge of it had come to him solely in his official capacity, and of the instructions from the Treasury and Internal Revenue Department, and for this refusal he was adjudged guilty of contempt. This writ is brought for relief from commitment on this judgment.

"That the national and state government have each a separate jurisdiction for their operations, although within the same territory, seems to be well and clearly shown in many cases in the Supreme Court of the United States whose authority must be paramount; and especially by In re Neagle, 135 U. S. 1, 10 Sup. Ct. 658 [34 L. Ed. 55], where the relator was released from a charge of murder in a state court for a killing done in protecting a United States judge traveling on his official business. This killing was held to be as much without the jurisdiction, although within the limits of the state, as if it had been done without its limits. The federal government could doubtless lay these internal taxes upon liquor dealers, and provide for their collection by collectors and deputies, or otherwise, and by methods, open or secret, accessible or inaccessible, or accessible only in prescribed ways, for evidence in its own or the state courts. It did provide that the fact of the payment of the tax should be open to all, and that proof of it should be accessible to all by examination of the authentic alphabetical list of the taxpayers and their places of business, for public inspection, in collector's offices, and by the stamps conspicuously to be kept by sellers on the places of business. The provision of these open and convenient methods of proof of this fact somewhat excludes the use of any government agencies otherwise for that purpose. The federal law is to be resorted to for ascertaining whether the instructions or directions are contrary to law; and they do not appear to be in any respect opposed to it, but rather to be in accordance with it. The relator, as federal officer, was in duty bound to obey them. This fact of payment of the special tax, of which the federal law provides such convenient proof, is exactly what the state statute makes evidence of being a common seller, and of keeping a nuisance. When the state lays hold of a federal officer, and his doings as such, for proof contrary to his duty in respect to the tax, instead of resorting to the evidence provided by that government, it interferes with the lawful operations of the federal government in laying and collecting its taxes. The federal government cannot dictate as to evidence in state courts, but it cannot be required to provide evidence for them; and the state has no right to federal instruments of purely federal character for proof, unless they are left within its reach, and these are not, but are put without that reach. This is somewhat as if a federal district attorney or grand juror should be imprisoned to compel disclosure of proceedings before the grand jury, which might be very material in a trial elsewhere. This disclosure would be contrary to legal duty, as that would be, and such imprisonment would seem to be quite clearly contrary to the laws of the United States."

In re Lamberton, supra, was also a habeas corpus case before Judge Rogers in the Western district of Arkansas. After setting out the statutes and rules and regulations of the Treasury Department, as shown above, Judge Rogers concludes his views on the question as follows:

"No doubt can be entertained as to the power of the Secretary of the Treasury, or of the commissioner of internal revenue with the approval of the

Secretary of the Treasury, to promulgate this order, the validity of which is upheld in the above case. It will be seen, by a careful reading of this regulation of the Treasury Department, that it does not cover precisely the questions to which answers are sought in this case. It related to the giving of information within the knowledge of the internal revenue collector of Kentucky, and found in the records of his office; and all of the cases, so far as I have been able to find, related to information contained in the records of the office of the internal revenue collector. In re Huttman (D. C.) 70 Fed. 699; In re Weeks (D. C.) 82 Fed. 729; In re Comingore (D. C.) 96 Fed. 552, affirmed in Boske v. Comingore, 177 U. S. 459, 20 Sup. Ct. 701, 44 L. Ed. 846. Opposed to the views expressed in the above opinion is the case of In re Hirsch (C. C.) 74 Fed. 928.

"While the precise question involved in this case is not decided in any of these cases, I have been unable to distinguish between the principle decided and the principle involved in the case at bar. The very fact that the retail liquor dealer's stamp was required to be posted by the persons buying, in their establishment or place of business, came to the knowledge of the revenue collector by reason of the person buying it making application therefor; and the issuance of it, and the record made of it, was contained within the files and records of the collector's office. Having obtained this information in that way, the collector or his deputy, as will be seen by an examination of the section of the statute above referred to, is required to proceed to the place where these stamps are required to be put up, in order that they may see whether they are posted as required by section 3239, Rev. St. U. S. (U. S. Comp. St. 1901, p. 2093). But for such knowledge on the part of the collector or his deputy, neither the one nor the other, in all probability, would have visited the place where these special-tax stamps are required to be posted. The information, therefore, acquired by the deputy revenue collector in the beginning, is traceable to the records of the collector's office. It has been distinctly held, in the case of Boske v. Comingore, supra, that the officers in charge of these records cannot be compelled to disclose their contents. It would be a manifest invasion of the principle decided if the court should hold to the letter of the law and decide that the internal revenue collector cannot be required to produce his records, or disclose what they contain, but at the same time disregard the reason, and hold that he can be compelled to disclose what he has discovered in the discharge of his duties as the result of information contained in the records. If the one is privileged, clearly the other is. It would therefore seem that the principle involved in the case at bar cannot be fairly distinguished from the Comingore Case."

The Comingore Case was originally decided by Judge Evans in the District Court of Kentucky (In re Comingore [D. C.] 96 Fed. 552), and was affirmed by the Supreme Court in Boske v. Comingore, 177 U. S. 459, 20 Sup. Ct. 701, 44 L. Ed. 846.

· In re Hirsch (C. C.) 74 Fed. 928, is not in harmony with the foregoing decisions, in that it holds that a deputy collector of internal revenue should be required to produce his records before the court; but this case undoubtedly is overruled by the decision of the Supreme Court in Boske v. Comingore, supra.

The foregoing authorities seem conclusive of the present inquiry. They establish the proposition, undoubtedly, that information obtained by a person solely in his official capacity as internal revenue officer cannot be divulged by him even when called as a witness in the state court. The method prescribed by the Secretary of the Treasury for courts obtaining this information is an application to the Secretary of the Treasury by the judge of the court in which the information is desired as to the operation of a distillery, when a certified copy may be obtained of the reports of the distiller, which will show fully and accurately all that has been done in any given distillery.

It is unfortunate that the present condition exists. The state absolutely prohibits within its limits the manufacture of distilled spirits, while the United States government makes no objection to its manufacture so long as the taxes required by law are paid. I would be glad to see some way, under the statutes, the rules and regulations of the Treasury Department, and the decisions of the courts, by which Stegall could be required to answer the questions propounded to him by the state court, because courts of the United States should incline toward agreement with the courts of the state, and will do so as far as possible. In this view I have endeavored to see the matter in the way it was so ably presented by the Attorney General, and his associates, but am unable to do so.

Stegall was at this distillery solely and only as a storekeeper and gauger; all the knowledge he has he obtained while there in that capacity. If Stegall had gone to the distillery otherwise than officially —simply gone there as a visitor—and when not on official business, undoubtedly he should be required to state what he saw. Otherwise, I do not see how he can be required to do so.

It was urged in argument that the United States does not, and should not, desire to interfere with the enforcement of the criminal laws of the state. This is true, undoubtedly. If Cureton is running this distillery as he appears to be doing from what is gathered in this hearing, the government of the United States, under the internal revenue law, will collect the taxes due the United States, and it seems a storekeeper and gauger must be put there to ascertain and keep account of the product of the distillery. Neither the internal revenue officers, or any one else connected with the United States government, can or will, under any law that I am aware of, interfere or place any obstacles in the way of the state, if it, at any time, desires to break up this distillery. The revenue officers are simply collecting the taxes due the United States government as long as the distillery is in operation. A storekeeper and gauger is not put at a distillery to protect the distillery, in any way, from the enforcement of the state law.

The whole question comes to this: When a distillery is being operated, a storekeeper and gauger is placed there to ascertain the quantity of distilled spirits made at the distillery, in order that the government may collect the taxes. They are there under the provisions of the statute (Rev. St. § 3167) and the regulation of the Treasury Department, having the effect of law, as stated, that they shall not produce any records or testify as to the contents of records, and, further, that they shall not testify as to facts "coming to their knowledge in their official capacity"; but the same regulation provides that information desired, as to the operation of a distillery, will, upon request of the court desiring such information, be furnished under the seal of the Treasury Department. If a change is needed, it must be made by Congress or by the Secretary of the Treasury. The courts cannot make or change law.

Stegall was placed in jail by the judge of the state court and fined $300 for declining to testify as to what was being done at Cureton's distillery, as stated above. He was actually in jail when the applica-

tion for writ of habeas corpus was made and when the writ was issued. What is the duty of this court in the present situation?

The present case is clearly not one coming under the rule that a person in state custody should go through the courts of the state, and from the highest court of the state, to the Supreme Court of the United States, by writ of error from the latter court; but it is one of the exceptional cases, under all the authorities, where, being held in violation of a law of the United States, he is, under the peculiar facts, entitled to a determination of the question here, and, if entitled to relief, to be discharged by this court.    In Boske v. Comingore, supra, Mr. Justice Harlan says on this subject:

"Of the power of the District Court to discharge the appellee if he was held in custody in violation of the Constitution of the United States, no doubt can be entertained.    It is true that in Ex parte Royall, 117 U. S. 241, 251 [6 Sup. Ct. 734, 29 L. Ed. 868], it was said that, although a court of the United States had power to discharge one held in custody by state authorities in violation of the Constitution of the United States, it was not bound to interpose immediately upon application being made for the writ, but should exercise the discretion with which it was invested 'in the light of the relations existing, under our system of government, between the judicial tribunals of the Union and of the states, and in recognition of the fact that the public good requires that those relations be not disturbed by unnecessary conflict between courts equally bound to guard and protect rights secured by the Constitution.'    Hence, the general rule that courts of the United States should not interfere by habeas corpus with the custody by state authorities of one claiming to be held in violation of the Constitution or laws of the United States, until after final action by the state courts in the case in which such custody exists.    Ex parte Royall, above cited;  New York v. Eno, 155 U. S. 89 [15 Sup. Ct. 30, 39 L. Ed. 80], and authorities cited;  Whitten v. Tomlinson, 160 U. S. 231 [16 Sup. Ct. 297, 40 L. Ed. 406], and authorities there cited. But to the general rule there are exceptions which are thus indicated in Ex parte Royall: 'When the petitioner is in custody by state authority for an act done or omitted to be done in pursuance of a law of the United States, or of an order, process, or decree of a court or judge thereof; or where, being a subject or citizen of a foreign state, and domiciled therein, he is in custody, under like authority, for an act done or omitted under any alleged right, title, authority, privilege, protection, or exemption claimed under the commission or order, or sanction of any foreign state, or under color thereof, the validity and effect whereof depend upon the law of nations—in such and like cases of urgency, involving the authority and operations of the general government, or the obligations of this country to, or its relations with, foreign nations, the courts of the United States have frequently interposed by writs of habeas corpus and discharged prisoners who were held in custody under state authority.'

"The present case was one of urgency, in that the appellee was an officer in the revenue service of the United States whose presence at his post of duty was important to the public interests, and whose detention in prison by the state authorities might have interfered with the regular and orderly course of the business of the department to which he belonged.    The District Court therefore did not err in determining the question of constitutional law raised by the application for a writ of habeas corpus, and rendering final judgment."

I have given this case the most careful examination and consideration, because its importance merits it.    The courts of the United States will not lightly interfere with the action of the state court, and a case must be presented to make action imperative before such action will be taken.

I am compelled to enter an order that the petitioner be discharged.